No. 2--96--0966

________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

________________________________________________________________

TECHALLOY COMPANY, INC. ) Petition for Review of an

) Order of the Property Tax

Petitioner-Appellant, ) Appeal Board.

)

v. ) No. 93--1281--R--1

)

THE PROPERTY TAX APPEAL BOARD;  )

MAX COFFEY, SHARON THOMPSON,    )

CHARLES CAIN, HOMER HENKE, )

MICHAEL BROWN, as Chairman and )

Members of the Property Tax )

Appeal Board; THE McHENRY )

COUNTY BOARD OF REVIEW; MARENGO )

FIRE PROTECTION DISTRICT; )

MARENGO-UNION CONSOLIDATED )

SCHOOL DISTRICT No. 165; and )

MARENGO COMMUNITY HIGH SCHOOL )

DISTRICT No. 154, )

)

Respondents-Appellees. )

________________________________________________________________

JUSTICE INGLIS delivered the opinion of the court:

Petitioner, Techalloy Company, Inc., appeals the decision of respondent, Illinois Property Tax Appeal Board (PTAB), denying petitioner's request to reduce the assessed value of its property to zero for taxation purposes.  We affirm.

Petitioner is a wire products manufacturer.  Its manufacturing facility, consisting of several masonry, steel, and wood buildings totaling 107,600 square feet, is located on a 41.38 acre parcel of land in Union, Illinois.  For the tax year 1993, the Coral Township assessor assessed petitioner's property at $731,220, reflecting a fair market value of $2,193,660.  Petitioner appealed the assessment to the McHenry County Board of Review (Board of Review).  The Board of Review denied petitioner's appeal.  On March 16, 1994, petitioner appealed the Board of Review's decision with the PTAB.

In its appeal to the PTAB, petitioner filed an appraisal of its property asserting that the correct assessment for its property was $0, reflecting a fair market value of $0 due to the costs to remove contamination caused by pollution.  Petitioner's appraisal also indicated that the fair market value of the property in the absence of the pollution was $1,360,000 and that cleanup monitoring costs were $1,710,000, which, when subtracted from the fair market value, resulted in a negative market value.

Respondents, Marengo-Union Consolidated School District No. 165, Marengo Community High School District No. 154, and Marengo Fire Protection District (intervenors), requested leave to intervene in petitioner's appeal based on their interest as taxing districts.  Intervenors filed their own appraisal of petitioner's property which determined that, assuming no environmental contamination, the property had a fair market value of $1,600,000.  Intervenors' appraisal specifically noted that the impact of environmental contamination was not included in the analysis of the property.  It also noted that petitioner had not given intervenors any information concerning the severity of the environmental contamination or the cost of curing it.

The matter proceeded to a hearing before the PTAB on March 20, 1996.  The parties stipulated that the correct tax assessment, excluding contamination, was $493,333, reflecting a fair market value of $1,480,000.  The only issues before the PTAB were whether the alleged contamination warranted a reduction in the fair market value and tax assessment of the facility and, if so, the amount of the reductions.

Petitioner called Carlos Serna (Serna), a hydrogeologist, as its first witness.  Intervenors objected to Serna's testimony because petitioner had not provided the intervenors' appraisers with any information regarding contamination despite the appraisers' repeated attempts to obtain the information to use in preparing their appraisal.  The PTAB hearing officer reserved his ruling and permitted Serna to testify.

Serna testified that he was employed by Weston Corporation (Weston), an environmental consulting firm.  Serna first became involved with petitioner in 1989 when Weston was hired to study petitioner's problem.  Serna's responsibility was solving the problem of groundwater contamination, his area of expertise as a hydrogeologist.

Serna's first task was to close certain "RCRA units" at petitioner's facility.  RCRA (an acronym for the federal Resource Conservation and Recovery Act (42 U.S.C. §6921 
et seq.
 (1988))) is a regulatory process by which the federal government and the state control the management and disposal of hazardous waste.  Serna recounted that petitioner's property had previously been used as a hazardous waste treatment facility.  He estimated that the contamination began during the 1950s and probably stopped during the mid-1970s.  Serna stated that petitioner had no immediate intention to close the facility, which had been fully operational since 1989.  He indicated that only one residential property had been affected by the groundwater contamination; no other properties had been affected, and petitioner installed a deep well for the affected homeowner.  Serna noted that petitioner's property was not listed in the CERCLA (the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §9601 
et seq.
 (1988))) database, but was listed as an RCRA corrective action facility.  While petitioner's property was no longer used to treat hazardous waste, according to federal procedures, it was required to close certain hazardous waste treatment units of the facility.  Serna's own involvement began with the closure of the treatment units regulated by the Illinois Environmental Protection Agency.  

During the process of closing the RCRA units, Weston identified the extent of the groundwater contamination problems by performing on- and off-site studies.  After closing the RCRA units, the United States Environmental Protection Agency (USEPA) became involved in an enforcement action against petitioner resulting in the entry of a 50-page consent order requiring petitioner to investigate and remedy the groundwater and soil contamination.

Serna's testimony turned to five pages from reports he had prepared and which petitioner's appraiser used in his determination of the fair market value of the facility.  The first two pages contained a map showing concentrations of various groundwater contaminants taken from various sampling sites on and off the facility and a legend explaining the symbols on the map.  Serna testified that, from the sampling sites, boundary lines had been drawn on the map indicating the areas in which the concentrations of various contaminants exceeded the maximum allowable levels set by the United States Environmental Protection Agency.

Serna testified that the next two documents concerned the projected schedule and estimated costs for the implementation of the consent order.  The consent order consisted of three phases:  (1) interim measures; (2) a facility investigation pursuant to RCRA regulations; and (3) a corrective measure study.  Serna explained that petitioner was planning to install an extraction well to collect contaminated groundwater which had moved off-site and pump it to a treatment plant.  Petitioner had 270 days in which to install the system in order to comply with the consent order.  Petitioner had incurred approximately $112,000 in design costs for the system and would incur additional costs for the operation and maintenance of the system after it was installed.  Serna testified that the total costs for the interim measures would be approximately $1.3 million, with $1 million to be incurred within the year.  The costs for the remaining phases of the consent order would be about $1.8 million incurred over 25 years.

On cross-examination, Serna stated that he did not remember any telephone conversations with intervenors' appraiser in 1994, nor did he recall any attempts by intervenors' appraiser to obtain information from Weston regarding environmental contamination at petitioner's facility.  He also testified that the contamination did not affect the water supply at the facility because it drew water from a deeper, uncontaminated source and that it posed no threat to petitioner's employees.  Serna admitted that none of the documents used by petitioner's appraiser contained any information concerning the permissible concentrations of the relevant contaminants around petitioner's facility under either federal or state standards, nor were they contained in the appraiser's report.

Serna also testified on cross-examination that petitioner purchased the facility in 1989 or 1990 and afterwards learned of the contamination.  He stated, however, that petitioner had hired another consultant to perform an environmental assessment of the facility before it was purchased in 1989.

Serna testified that he did not know who was responsible for paying for the cleanup.  He agreed that there were no invoices or other supporting documents concerning the costs of the components of the corrective action; the documents he had provided to petitioner's appraiser were simply estimates of the costs.  Petitioner introduced no documentary evidence with Serna, such as copies of his reports, or the consent order with the United States Environmental Protection Agency.

Petitioner next called Michael Lipowsky, who performed the appraisal analysis of petitioner's property.  Lipowsky stated that, in preparing his appraisal, he had relied upon two articles concerned with the effect of environmental contamination on fair market value and the five pages of documentation contained in Addendum G to his appraisal.  Lipowsky also testified that he had relied on conversations with petitioner in order to perform his evaluation of the contamination.  Lipowsky's appraisal did not cover what, if any, post-cleanup procedures are required by the United States Environmental Protection Agency; he stated that he relied on conversations with Weston for that information.  He had not reviewed the consent order, nor was a copy attached to his appraisal.  Lipowsky did not know whether any of the estimated cleanup costs had actually been expended, nor could he say who was ultimately responsible for the cleanup costs.  He had not obtained verification of the contamination from either the United States or Illinois Environmental Protection Agencies.  Petitioner rested its case following Lipowsky's testimony.

The intervenors called the two appraisers who prepared their appraisal of petitioner's property.  Dennis Hawkinson (Hawkinson) was called first and testified that one of petitioner's employees briefly mentioned the contamination to him as he was inspecting petitioner's plant.  Hawkinson asked the plant manager if he could obtain any documentation or reports about the contamination at the facility.  The plant manager referred Hawkinson to Serna.  When Hawkinson telephoned Serna requesting environmental reports and other information about the contamination, Serna maintained that he was not at liberty to release any of the requested information and referred him to Mr. Lopes, another of petitioner's employees.

Hawkinson repeatedly attempted to obtain information about environmental audits, cleanup schedules, and projected costs.  On August 4, 1994, Hawkinson requested the information from Lopes and was informed it would be mailed to him.  After a couple of weeks had passed with no information, Hawkinson again telephoned Lopes, leaving a number of messages.  On August 31, 1994, Hawkinson wrote to Lopes, requesting the environmental documentation in order to complete his appraisal.  Hawkinson never received a response.

Hawkinson testified that the only information about the contamination at petitioner's facility was that contained in petitioner's appraisal.  Hawkinson stated that the Uniform Standards of Professional Appraisal Practice prohibited him from relying on that information.  He stated that there simply was insufficient information available to him to properly analyze the effect of the contamination on the value of petitioner's property.  He indicated that had the information been provided to him, it would take about 60 days to analyze it.

Next, intervenors called Frank Harrison (Harrison), who testified that Lipowsky had not complied with the standard appraisal rules with respect to the contamination issues as his appraisal contained only a very small amount of documentation relating to the environmental issues raised by the contamination at petitioner's facility.  Harrison stated that he "wouldn't dare" render an appraisal on the issue of contamination using only the information presented in the Lipowsky appraisal.  He noted that Lipowsky had apparently relied on conversations and other information not included in the appraisal report.  He was unable to conclude whether Lipowsky had complied with the standard appraisal rules.  Nevertheless, Harrison stated that he believed giving an appraisal based only on the information contained in the Lipowsky document would be negligent and possibly a violation of the ethics rules governing appraisers as the report could be misleading.  Harrison also noted that, if a property were contaminated to the extent that it had no value, then it would be condemned and shut down.

After the close of evidence, the parties submitted post-hearing briefs.  Petitioner attached a copy of a letter dated February 19, 1996, which it delivered to intervenors' counsel offering finally to supply intervenors' appraisers with the environmental contamination information they had requested in the summer of 1994.  Petitioner did not, however, include any of the offered information in the letter.

The PTAB issued its decision on July 12, 1996.  The PTAB accepted the stipulation of the parties and, without taking account of the alleged contamination, lowered the petitioner's assessment from $731,220 to $493,333.  The PTAB concluded, however, the evidence did not support petitioner's contention that contamination had reduced the market value of the property to zero.  Noting the paucity of the evidence of contamination at petitioner's facility, the PTAB found the "evidence to be unsupported and unsubstantiated."  The PTAB based its finding on petitioner's failure to produce the entire environmental report, the consent decree, or any substantive evidence of actual costs incurred in 1993 for the cleanup of the contamination.  Petitioner's timely petition for direct review in this court followed.

We first review the legal standards by which the PTAB rendered its decisions and the principles of judicial review of an administrative decision.  The PTAB "is required to decide the correct assessment of the subject property on the basis of the evidence received at the hearing."  
Illini Country Club v. Property Tax Appeal Board
, 263 Ill. App. 3d 410, 416 (1994).  The taxpayer (in this case, petitioner) has the burden of proving that the assessment is excessive, and the proof must be by clear and convincing evidence.  
Illini Country Club
, 263 Ill. App. 3d at 416.

When conducting an administrative review, the reviewing court accepts the agency's finding and conclusions on questions of fact as 
prima
 
facie
 true and correct.  735 ILCS 5/3--110 (West 1994).  The reviewing court's scope of review is limited to determining whether the administrative agency's findings of fact are against the manifest weight of the evidence.  
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88 (1992).  The reviewing court's function is not to reweigh the evidence or reassess the credibility of the witnesses, nor may it substitute its judgment for that of the administrative agency; rather, the reviewing court's function is to insure that the administrative agency arrived at an objective, rational decision after a fair hearing at which competent evidence was introduced.  
Mead v. Board of Review
, 143 Ill. App. 3d 1088, 1095 (1986).

The administrative agency's decision is against the manifest weight of the evidence if "all reasonable and unbiased persons, acting within the limits prescribed by law and drawing all inferences in support of the finding, would agree that the finding is erroneous and that the opposite conclusion is clearly evident."  
Jagielnik v. Board of Trustees of Police Pension Fund
, 271 Ill. App. 3d 869, 875 (1995).  That the reviewing court might have ruled differently or an opposite conclusion is reasonable will not justify the reversal of the administrative agency's findings.  
Sindermann v. Civil Service Comm'n
, 275 Ill. App. 3d 917, 922 (1995).  If the administrative agency's decision is supported by evidence contained in the record, it should be affirmed.  
Abrahamson
, 153 Ill. 2d at 88.

The reviewing court may also reverse an administrative agency's decision if it has erred as a matter of law.  The reviewing court does not give an administrative agency's legal conclusions the same deference as it gives to the agency's factual conclusions.  
Jagielnik
, 271 Ill. App. 3d at 875.

With the foregoing principles in mind, we next turn to petitioner's contentions.  Petitioner's argument on appeal is that the PTAB's decision was against the manifest weight of the evidence.  Petitioner contends that the PTAB raised its burden of proof by requiring certain documentary evidence "above and beyond the evidence produced at [the] hearing to establish the effect of the contamination."  Petitioner also asserts that the PTAB ignored the uncontradicted and unimpeached evidence of environmental contamination presented by its expert witness, Serna.  In a related vein, petitioner asserts that the testimony of intervenors' appraisers also failed to controvert that of petitioner's appraiser, and, thus, the PTAB ignored this evidence as well.  Finally, petitioner charges that the PTAB acted in an arbitrary and capricious manner by noting the absence of substantive evidence explaining the actual costs petitioner incurred during cleanup activities and failing to require petitioner to present new or additional evidence of actual cleanup costs incurred during 1993.

We first note that, in addition to arguing that the PTAB's decision was not against the manifest weight of the evidence, intervenors also argue that, on grounds of public policy, we should reject petitioner's arguments.  Intervenors urge that taxpayers should not have to subsidize the cleanup of petitioner's pollution through property tax reductions.  The parties indicate that this would be an issue of first impression for the courts of this State.  We do not need to reach this novel issue, however, because we conclude that the PTAB's decision was not against the manifest weight of the evidence.

Petitioner first points to three statements made by the PTAB in its memorandum of decision.  The PTAB stated that (1) petitioner "failed to provide the entire environmental report which should have been produced by Weston"; (2) petitioner "failed to produce the consent decree, between [petitioner] and the USEPA ***.  It seems that this would be an important piece of documentation"; and (3) petitioner failed to provide "documentation explaining what party was genuinely responsible for the payment of the remediation procedures."  Petitioner contends that the PTAB erred as a matter of law in making each of these three statements, asserting that the PTAB impermissibly increased the petitioner's burden of proof by requiring evidence in addition to that which petitioner produced at the hearing.  We disagree.

It is helpful to place the statements in the full context of the PTAB's decision.  The PTAB stated, in pertinent part:

"After hearing the testimony and reviewing the record, the [PTAB] finds that it has jurisdiction over the parties and the subject matter of this appeal.  Based on all of the evidence contained in the record, the [PTAB] further finds that, based on the parties' stipulation agreement, a reduction is warranted.  The [PTAB] does not, however, find that a further reduction was supported by [petitioner's] evidence of the subject's site contamination.  In support of its contamination argument, [petitioner] presented the testimony of two expert witnesses.  The first witness offered by [petitioner] was a geologist/hydrogeologist from the Weston Corporation, a national/international environmental consulting firm.  The witness testified [that] the Weston Corporation worked with companies to solve their environmental problems dealing in the area of hazardous waste.  The witness stated his specialty was in the area of ground water contamination.  In summary, the substance of the witness'[] testimony included information regarding [petitioner's] consent decree with the USEPA, the chemicals present on the subject site[,] and the three[-]step plan designed by Weston for the contamination clean-up, which included the schedule and costs of the operation.

The second witness offered by the appellant was the preparer of [petitioner's] appraisal of the subject property.  He testified to the four forces affecting value and identified one of those force[s] to be environmental forces such as topography, climate conditions and toxic contaminants.  As a part of his appraisal, the witness performed an analysis of the loss in value to the subject property caused by the alleged contamination.  Using the 
Assessment Digest
, which outlined a methodology to measure the impacts of environmental conditions on real property, and the evidence provided by the Weston Corporation, the witness analyzed the contamination evidence and its effect on the subject's market value.  The appraiser concluded the cost to cure the contamination problem at the subject site caused the subject property to have a negative market value as of January, 1993.

The [PTAB] finds the appellant failed to provide substantive evidence to support its claim that the subject property's market value was zero due to the contamination located on the subject site.  The only evidence contained in the record concerning the contamination problem consists of two letters explaining the potential costs which could be incurred by [petitioner], a schedule of work to be done by Weston which also detailed the time frame and costs to be incurred, and a groundwater map survey detailing the types and levels of chemicals present.  This was the evidence [petitioner's] appraiser relied on when he performed his loss in value analysis of the subject property.  The [PTAB] finds this evidence to be unsupported and unsubstantiated.  [Petitioner] failed to provide the entire environmental report which should have been produced by Weston.  Instead, [petitioner] only produced three pages of documentation which does not explain the federal or state standards regulating the types of chemicals and the acceptable levels of the chemicals discussed by Weston's representative and expert witness.  Furthermore, [petitioner] failed to produce the consent decree, between [petitioner] and the USEPA, which was discussed by [petitioner's] expert witness.  It seems that this would be an important piece of documentation supporting [petitioner's] claim.  Lastly, the record is absent of any substantive evidence explaining the actual costs incurred by [petitioner] in 1993 for the clean-up program and is void of any documentation explaining what party was genuinely responsible for the payment of the remediation procedures."

Thus, contrary to petitioner's assertion, the PTAB simply found that the evidence of the property value of petitioner's facility was unsupported and unsubstantiated.  The statements of which petitioner complains relate to the types of evidence which petitioner, had it so chosen, could have introduced to support its claims.  We do not see that the PTAB was raising the evidentiary standard; rather it was commenting on the deficiencies of petitioner's evidence.  Accordingly, not only are the PTAB's conclusions not errors of law, but also they are not against the manifest weight of the evidence.

Petitioner also argues that, because the PTAB believed the documentary evidence it found lacking in petitioner's presentation of its case to be important, it should have compelled petitioner to produce those documents.  See 86 Ill. Adm. Code §1910.67(h)(1)(D) (1996) (giving the PTAB authority to require production of documentary evidence).  Petitioner misconceives the PTAB's responsibility in this matter.  The PTAB adjudicates petitioner's appeal; it does not also try petitioner's case for it.  To hold otherwise would turn the adversarial process on its head.  Petitioner made the strategic choice to introduce only its appraiser's written report into the record.  In hindsight, petitioner cannot now bemoan its choice and blame the PTAB for failing to save it from itself.  We reject this argument.

Petitioner next argues that the PTAB ignored the uncontradicted evidence presented by both Serna, the hydrogeologist, and Lipowsky, the appraiser.  In this, petitioner concludes that the PTAB acted arbitrarily and capriciously.  We disagree.

We reiterate that the PTAB found that petitioner had not proved the amount by which the contamination decreased the value of petitioner's facility.  Intervenors' witnesses both testified that they believed contamination existed, but that they were not able to obtain any information from petitioner which would allow them to place a value on it.  Intervenors' witnesses, both of whom were appraisers, also testified that petitioner's appraiser did not have enough information on which to base an opinion about the effect of the contamination on the value of petitioner's property.  In this, they most certainly controverted the testimony of petitioner's appraiser.  The PTAB was entitled to accept this testimony over that of petitioner's appraiser and to conclude that petitioner had not proved its case regarding contamination.  
Oregon Community Unit School District No. 220 v. Property Tax Appeal Board
, 285 Ill. App. 3d 170, 175 (1996).

Finally, petitioner argues that the PTAB failed to require the submission of new evidence of actual costs incurred during the cleanup of the contamination.  This is analogous to its earlier argument that the PTAB should have compelled the production of documents petitioner chose not to introduce, and we again reject the argument.  Petitioner contends that the costs projected in 1993 had become certain by the time that its appeal was heard by the PTAB.  But, in the intervening time between filing its appeal and the hearing, petitioner never submitted any information regarding the now-certain costs.  Moreover, it did not even attempt to include those actual costs in its proofs at the hearing.  Petitioner's argument is without merit.

For the foregoing reasons, the decision of the PTAB is affirmed.

Affirmed.

McLAREN and HUTCHINSON, JJ., concur.